**UNITED STATES of America,
Libellant,**

v.

**ARTICLES OF DRUG Consisting of Undetermined Quantities of Vitamin, Mineral, and Other Dietary Preparations * * *, FOODS PLUS, INC., (Claimant), Defendant.**

Civ. A. No. 79-62.

United States District Court
D. New Jersey.

March 4, 1965.

466

David M. Satz, Jr., U. S. Atty., by Vincent J. Commisa, Asst. U. S. Atty., and Salvatore Franchino, Washington, D. C., for the Government.

Herbert Alterman, Passaic, N. J., Bass & Friend, by Milton Bass, New York City, of counsel, for claimant.

WORTENDYKE, District Judge:

In its libel of information praying seizure and condemnation of certain articles of drug therein particularized, in the possession of Foods Plus, Inc., (hereinafter Foods Plus or claimant) in this District, the United States of America charges that the articles described were misbranded when introduced into, while in, and while held for sale after such shipment in interstate commerce, within the meaning of 21 U.S.C. § 352(a)[1] and

§ 352(f) (1).[2] Seizure was effected on January 30, 1962, under appropriate process, and notice of claim to the articles seized was filed by Foods Plus, Inc. Claimant denies the misbranding charged. This Court has jurisdiction of the subject matter of the cause and of the parties in interest therein. 21 U.S.C. § 334(a).

Libelant charges that the articles seized were misbranded under § 352(a) in that their labeling, i. e., the labels upon their containers and the booklet entitled "Foods Plus 1962 Vitamin Catalog" (hereinafter catalog) which accompanied the articles, contain statements which represent and suggest that the articles are superior to similar products available on the market because they were formulated by one Carlton Fredericks, Ph. D., who is alleged in the catalog to be an internationally prominent nutritionist; that vitamins are more effective in combination with each other and with minerals; and that the nutritional requirements of old people differ from those of adults generally.

The Government further charges that eight of the seized articles of drug were misbranded under § 352(a) in that their labeling (the catalog) represented them to be effective to promote a healthy, vigorous feeling; to promote growth in children; to convert fatty tissues into energy; to prevent tiredness and poor appetite, and the like.

Finally, the libel alleges that all of the seized articles were misbranded under § 352(f) (1) because Foods Plus, through its intimate relationship with Carlton Fredericks, a radio commentator in the field of nutrition, represented the various articles to be effective in the prevention and mitigation of disease conditions, but that neither he nor any labeling (the catalog included) prescribed "adequate directions for use" of the articles as required by § 352(f) (1).

Claimant stipulated that the products seized were received after shipment in

1. "A drug or device shall be deemed to be misbranded—(a) [i]f its labeling is false or misleading in any particular."

2. "A drug or device shall be deemed to be misbranded—(f) [u]nless its labeling bears (1) adequate directions for use."

interstate commerce, and that its catalog constitutes labeling of the seized articles as defined in § 321(m) of the Act [3], within the meaning of §§ 352(a) and 352 (f) (1). Claimant also concedes that some of the seized articles are drugs as defined in § 321(g) of the Act. Claimant denies, however, that the statements made in its catalog amount to the representations charged by the Government, or lack the directions for use of its products required by § 352(f) (1). More specifically, claimant insists that its catalog does not state that its products are superior to similar products available on the market, but that it merely discloses that Carlton Fredericks is claimant's consultant; that he has prescribed the formulas for certain of claimant's products offered in the catalog; and that he endorsed those products. Claimant does admit that its catalog states that there are no finer quality vitamins at any price, and that claimant's vitamins are the finest quality vitamins at lowest possible prices. The catalog admittedly characterizes Fredericks as an internationally prominent nutritionist, but it does not state that he is internationally and prominently *recognized as an authority* on nutrition. Claimant also denies that its catalog states that the nutritional requirements of people of old age are different from those of adults generally, but insists that the statement therein that vitamin and mineral deficiencies may become more common as we grow older because of restricted diets, digestive disturbances, difficulties in chewing and limited taste preferences is a true statement of fact. In sum, claimant contends that every statement set forth in its catalog is true and correct.

With regard to the Government's charge that the claimant's products are misbranded under § 352(f) (1) of the Act, claimant denies (1) that the radio broadcasts of Fredericks were advertising for or representations in behalf of claimant's products; (2) that said broadcasts recommended the use of claimant's products in the treatment of various diseases; and (3) that claimant's labeling fails to list those diseases or conditions. Although the Government's contentions based upon § 352(a) may be valid, V. E. Irons, Inc. v. United States, 1 Cir. 1957, 244 F.2d 34, cert. den. 1957, 354 U.S. 923, 77 S.Ct. 1383, 1 L.Ed.2d 1437; United States v. "Vitasafe Formula M", D.C.N.J.1964, 226 F.Supp. 266, since the articles in question are clearly misbranded under § 352(f) (1), the question as to their misbranding under § 352(a) has not been further considered.

Shortly after issue was joined, *claimant* moved for summary judgment *in favor of the libellant,* upon the ground that claimant recognized that an honest difference of opinion could exist as to whether the articles were misbranded under § 352(a). For this reason claimant sought a decree holding that the articles seized were misbranded under § 352(a) but authorizing their release from seizure for the purpose of relabeling by claimant in conformity with the requirements of the section. In support of this motion, claimant represented that its previous contractual relationship with Carlton Fredericks had by then terminated. Claimant persisted, however, *in contending that the articles were not* misbranded under § 352(f) (1), and refused to consent that the suggested decree so adjudicate. Claimant's motion was denied, and libellant's cross-motion for leave to amend the libel by including a prayer for injunctive relief prevailed.

3. "The term 'labeling' means all labels and other written, printed or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." Section 321(m).

   "The term 'label' means a display of written, printed, or graphic matter upon the immediate container of any article; and a requirement made by or under authority of this chapter that any word, statement, or other information appear on the label shall not be considered to be complied with unless such word, statement, or other information also appears on the outside container or wrapper, if any there be, of the retail package of such article, or is easily legible through the outside container or wrapper." Section 321(k).

■ The Government's charge of misbranding under § 352(f) (1) of the Act is predicated upon its assertion that the seized vitamins, minerals and dietary supplements are drugs and that their "labeling" failed to disclose adequate directions for their use "for the many disease conditions for which Carlton Fredericks represented them as being effective in his radio broadcasts, which were merely disguised advertisements for the Foods Plus products." The Government does not claim that Fredericks' broadcasts should be treated as incorporated by reference in or forming a part of the "labeling" of the drug. Nevertheless, oral representations, such as these broadcasts, may be considered in determining the intended use of the vitamins. United States v. El Rancho Adolphus Products, 3 Cir. 1957, 243 F.2d 367, cert. den. 1957, 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136, reh. den. 1957, 354 U.S. 927, 77 S.Ct. 1376, 7 L. Ed.2d 1441; V. E. Irons, Inc. v. United States, supra; Nature Food Centres, Inc. v. United States, 1 Cir. 1962, 310 F.2d 67, cert. den. 1963, 371 U.S. 968, 83 S.Ct. 552, 9 L.Ed.2d 539. The reasoning upon which this claim of misbranding rests may be outlined as follows:

(1) the Food and Drug Act [specifically 21 U.S.C. § 352(f) (1)] requires that "adequate directions for use" of a drug be borne by its "labeling";

(2) the articles seized, which comprise various quantities of some 43 different formulas of vitamin, mineral and other dietary preparations, are drugs; and

(3) the labeling associated with the formulations does not contain adequate directions for the use of the articles seized. Therefore, argues the Government, these articles are misbranded, and were subject to seizure under 21 U.S.C. § 334.

■ The initial question here presented is whether the seized articles are drugs under the Act and so within the proscription of § 352(f) (1). In § 321 (g) (2) the term drug is defined as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." The Government conceded that it was required to show by the evidence that "(a) during the course of his radio programs, Carlton Fredericks made certain claims for the preventive, curative, and therapeutic properties of vitamins, minerals and proteins for use in certain disease conditions [and] (b) these claims were in reality representations or * * * advertisements for all the Foods Plus products, including those under seizure * * *." The crux of the Government's case is that Carlton Fredericks' radio broadcasts, his reputation, and his listening audience were exploited by Foods Plus in such a way as to implant in the mind of a person listening to these broadcasts (especially that of a regular listener), the idea that many of the ills of man, from simple malaise to a great number of diseases, could be prevented, mitigated, or cured by the ingestion of Foods Plus vitamins and dietary supplements.

Concededly accurate transcripts of radio broadcasts by Carlton Fredericks over Stations KGMC, Englewood, Colorado, WOR, New York City, and KLZ, Denver, Colorado, clearly disclose that, despite occasional admissions, that only medical people could advise a person on the therapeutic use of vitamins, Carlton Fredericks extolled the value of vitamin and mineral supplementation for use by the layman in the prevention, treatment and cure of disease.

On November 23, 1961, during a broadcast over Station KLZ in Denver, Fredericks said:

"Greetings, my friends, this is Carlton Fredericks, the program is Living Should be Fun. * * * This radio nutrition class [a weekly item on his daily programs] is on the air every Thursday on this station at this time. And the course is continuous so that the lessons you missed will be repeated * * * we are now discussing the subject of Vitamin E. You've missed the

discussion of Vitamin B Complex and Vitamin C and Vitamin A and D and the bioflavonoids. But those will be repeated as I said in the next session * * *. In the interim you can catch up with some of what you missed by reading my Vitamin Guide which is a publication I wrote really to answer a specific question * * * what kind of a vitamin supplement did you put together to take care of your children when * * * you were dissatisfied with the vitamin drop preparations which were on the market at that time?

"Well, I'm still dissatisfied * * and the formula I put together for my children has been placed on the market by several companies. And the vitamin supplements which Mrs. Fredericks and I use are on the market from dozens of companies. I'm concerned [,] you see [,] with formula—not with brand. * * *

"Now today we're continuing the discussion of Vitamin E which we began last week. * * * So because I know that such prejudice exists and because there are many commercial motivations for depressing the importance * * * of Vitamin E * * * I am therefore documenting every statement made * * *.

"Now we start with a disorder— and please remember we study the medical use of a vitamin—the medicinal use so that you may learn from what nutrition cures, how to prevent by shaping your diet properly. Vitamin E has been used in the treatment of arithro blastosis betallis * * *. * * * The outlook —the prognosis of the infant seems to be definitely improved.

"It is advisable to administer substantial amounts of Vitamin E to every pregnant Rh negative woman whose husband is Rh positive * * and to start the treatment by the end of the third month of pregnancy.

"Now that came from an article in Progressive Medicine * * *.

"Our next abstract comes from the proceedings for the Society of Experimental Biology and Medicine, 1940 * * * [the author] speaks of two patients with dermatomyocitis who were given * * * roughly 4 ounces of wheat germ daily and then he reports definite clinical improvement * * *.

"Now there is a disorder called fibrositis * * *. Primary fibrositis is sometimes diagnosed as lumbago or torticollis, which is rye [sic] neck, a muscular rheumatism or colds in a muscle or whatever.

"This is what the doctor said, writing in the American Journal of Medical Science 1941, volume 201. Thirty patients with primary fibrositis were treated with Vitamin E either as wheat germ oil or as a mixed natural Vitamin E concentrate. Complete relief was obtained by all patients.

*       *       *       *       *

"Now you may say, well why is it that the American physician is so cynical about Vitamin E—look, I cannot explain why a professional man will accept digitalis from foxglove but will not accept Vitamin E from vegetable oil, like wheat germ oil. Nor is it the province of the program to explain that. There is quite a long story to it and the story has very little to do with the merits of Vitamin E. It's a story of rivalry and dissention among politicians in medical circles and some other things which really have very little bearing on what we're trying to accomplish here.

"And what we're trying to accomplish is to get more Vitamin E into your diet. So let me close our journey today * * * by suggesting that you * * * get * * * any vacuum-packed brand of wheat germ * * * that you add it to cereal [and] white flour. * * * Let me

suggest that you * * * buy white bread with wheat germ added * * and then you're on the pathway toward decent Vitamin E intake. And this is Carlton, at your ease, Fredericks, wishing you a very good day and very good health to you all."

This recorded advertisement in Carlton Fredericks' voice then followed immediately:

"Greetings friends, this is Carlton Fredericks speaking. I believe as you do that the best advertising is by word of mouth and today that word is Foods Plus Vitamins from coast to coast because I think almost everybody knows about the money they save by buying direct from Foods Plus Vitamins. You too can save on vitamins up to 75%, tremendous savings made possible because Foods Plus Vitamins are sold direct to you and in the big Foods Plus catalog you'll find over 150 famous vitamin formulas compiled, formulated under my direction and you'll find big savings on vitamins, drugs and household remedies for every member of the family. This Foods Plus is the only vitamin house in America to carry my personal endorsement. Now when you buy from Foods Plus even the tiniest order is shipped out the same day and there are no extra charges ever. Do write to me for the catalog."

(Announcer) "To get your 64 page Foods Plus Vitamin catalog, write to Vitamin Catalog, care of Carlton Fredericks, KLZ, Denver 17, Colorado. That's Vitamin Catalog, care of Carlton Fredericks, KLZ, Denver 17, Colorado."

On the previous day, Fredericks' program over the same station included answers to some of the mail inquiries from his listeners. His remarks with respect to one letter were as follows:

"Another question: 'Do you have any special data on the treatment of arthritis with vitamin therapy? * * *' Yes, I have a good deal of data on the treatment of arthritis with vitamin therapy and good diet. This is available to the physician on request. I can't send it to the public. I am going to write a booklet on the subject with broad general outlines because actually the diet for arthritis is simply a good diet with the exception of the diet in gout, where there may be individual sensitivities — reactions to certain foods which will require individual management and where incidentally the medical man should not issue a printed diet either.

"The vitamin therapy however for arthritis being a therapy is given to the medical man only. My correspondent closes: 'I've been listening to your broadcasts wherever possible for the past six months. If everyone would heed the advice given on your program, we'd have a much healthier nation.'"

Altogether, in a succession of radio broadcasts from the stations above mentioned, during a period commencing on and with October 26th and terminating December 18th, 1961, Carlton Fredericks recommended to his listeners various vitamins and dietary supplements as remedies and/or preventives for human ailments which included the following: Respiratory diseases, circulatory diseases, cystic mastitis, club feet, paradentosis, neuritis, lowered thyroid activity, disturbed elimination, high blood pressure, strokes, rheumatic fever, tooth decay, allergies, damaged brain and nerve cells in children, multiple sclerosis, hardening of the arteries, lack of mental resistance to house-to-house salesmen, varicose veins, vertigo, mental disorders, lack of resistance to cancer, epilepsy, shingles, Bell's palsy, amyotrophic lateral sclerosis, lack of resistance to radiation, arthritis, gray hair, rheumatoid arthritis, mongolian idiotism, lupus erythematosus, sexual frigidity, heart disease, muscular dystrophy, coronary thrombosis, cerebral palsy, nervous system dis-

eases, Peyronie's disease, angina, diminished vigor, nervousness, glossitis, tartar on teeth, infertility in women, lack of mental alertness, for longer life, for tightening loose teeth, for pain and discomfort in glandular cycles, scleraderma, bursitis, and premenstrual tension, back ache and cramps.

This Court is impelled to the conclusion that these radio broadcasts of Carlton Fredericks, in which he presented abstracts of articles on nutrition together with his own comments thereon, were intended to urge or encourage the regular ingestion of vitamins as medicaments for the prevention, mitigation or cure of diseases in man. The question remains whether Foods Plus was a party to such intention. As the claimant notes, Carlton Fredericks had been presenting his radio series on nutrition for some years before he became connected with Foods Plus, and it was a radio station, not a drug or food manufacturer that had first syndicated these broadcasts. However, a finding that Foods Plus intended its vitamins to be used for the numerous disorders and conditions alluded to by Fredericks does not require that Foods Plus be shown to have conceived the idea of such radio broadcasts as those of Fredericks. Such a finding merely requires that it be shown that claimant acted in such a way as to avail itself of Carlton Fredericks' admonitions by identifying itself with the vitamins, etc., discussed on Fredericks' programs. Several facts indicate that Carlton Fredericks' broadcasts were so related to Foods Plus products. Advertisements by Carlton Fredericks of Foods Plus vitamin products were adjacent to (i. e., immediately succeeded) several of his programs. Whenever a listener responded to one of his offers to send the listener nutritional literature on sugar, menopause, gray hair, vitamins, protein deficiency, Vitamin E, or any of a host of other subjects alluded to in the course of Fredericks' radio broadcasts, the listener received a catalog from Foods Plus. (Claimant had acquired the mailing list resulting from responses to those broadcasts under a contract with Fredericks.) This catalog left no doubt that Foods Plus and Carlton Fredericks were very closely related. It disclosed that he was claimant's "Chief Consultant." His picture, name and title appeared in the upper right hand corner of the first page of the catalog, which expressly and emphatically exhorted the inquiring radio listener in the following vein:

"Surely you will agree your health is your most valuable asset. Insure your nutritional health confidently and economically with vitamin and mineral supplements manufactured by FOODS PLUS. Like millions of people, you too can have complete confidence in FOODS PLUS products and save by buying direct from the manufacturer.

"Carlton Fredericks, Ph.D., internationally prominent nutritionist, is FOODS PLUS' Chief Consultant. He has scientifically formulated the exclusive formulas in this catalog. The most popular of these formulas are FOODS PLUS Combinations 303, 305, 306 and 307 (Page 3).

"Today, Carlton Fredericks' devoted following numbers in the many millions. As his fans know, Carlton Fredericks lends his name and endorsement only to products in which he has complete confidence. They know that products bearing his name are produced in strict accordance with his high standards and specifications.

"Yes, you too can be confident when you buy FOODS PLUS products. There are no finer quality vitamins * * * at any price.

"FOODS PLUS is the only vitamin company privileged to carry Carlton Fredericks' name and receive his endorsement."

Once this catalog was read, especially by someone sufficiently interested in Carlton Fredericks' views to write to him for the material, a close relationship between Fredericks and Foods Plus be-

came a natural inference in the listener's mind.

Such a relationship was more than purely inferential; it was actually contractual, as appears from the following evidence.

A written agreement, dated August 1, 1960, between Foods Plus, Inc. and Carlton Fredericks recites that Foods Plus is engaged in the manufacturing and selling of vitamins, minerals and vitamin-mineral combinations. Fredericks is represented therein to be the author of various books and periodicals dealing with the subject of nutrition, and a writer and lecturer on that subject. It also recites that Fredericks is employed by Foods Plus as its consultant to approve, recommend, endorse and generally aid in the sale and promotion of the products of Foods Plus. The agreement continues that employment relationship and provides, *inter alia*, that Fredericks grants to Foods Plus the exclusive license, throughout the United States and Canada, to use his name and photograph in connection with the advertisement, promotion and sale of its products and to quote from or reproduce any of his copyrighted, trade-marked and other material in connection with such promotion and sale. Fredericks agrees not to grant any similar rights to or perform any of the specified types of services for any person or corporation other than Foods Plus. He also agrees to turn over to Foods Plus all mail received by him resulting from his radio, television or other public appearances, and authorizes Foods Plus to use the names obtained from such mail in connection with the advertisement, promotion and sale of its products within the territory described therein. Foods Plus agrees to pay Fredericks, as compensation for all services to be performed by him under the agreement and for the rights and privileges granted by him to Foods Plus, the sum of $200.00 per week. The agreement, by its terms, was to be effective during a period commencing August 1, 1960 and terminating July 31, 1975, but Foods Plus was accorded the privilege to terminate the agreement earlier in a specified manner, under certain conditions. Provision was also made, in the event of the death of Fredericks during the period of the agreement, for the continued enjoyment by Foods Plus of the rights acquired from him under the agreement, including the use of the name Fredericks, but at a reduced compensation of $100.00 per week. The contract was expressly nonassignable, and Foods Plus undertook to indemnify Fredericks against all actions and claims brought against Fredericks in connection with the advertisement and sale of products of Foods Plus. By a subsequent agreement between the same parties, dated February 9, 1962, 10 days after execution of the monition in this case, the agreement of August 1, 1960 was terminated, in consideration of the payment of $5,000 by Foods Plus to Fredericks. This terminating agreement provides that Foods Plus shall forthwith cease to use the name and likeness of Fredericks, and to make reference to him in its labeling, and that, for a period of five years from the date of the agreement, Fredericks shall refrain from publicly or otherwise endorsing or recommending vitamins and minerals, vitamin and mineral combinations and/or supplements, food supplements, pharmaceuticals and drug products of any manufacturer or distributor, excepting, however, "normal foods and foods enriched with vitamins proteins and/or minerals." Fredericks also agrees not to furnish or permit the use of the names or mail received by him from radio, television or other public appearances by any manufacturer or distributor of the articles above stated.

On January 8, 1960 Foods Plus entered into an advertising agency agreement with Curtis Advertising Co., Inc., and on September 10, 1960, Carlton Fredericks, as producer, and C. F. Productions Inc., as distributor, entered into an agreement for the taped broadcasting by radio of a series of programs known as "Living Should Be Fun". The agreement provided that each radio show should

be 25 minutes in duration, and should be produced for broadcast five times a week. The editorial content of each show and its suitability for broadcast was made subject to the exclusive supervision and control of Fredericks. This agreement was for a period of five years from the date thereof, but it was terminable by the producer (Fredericks) if the prescribed minimal gross billings had not been made, i. e., during the first year in the amount of $100,000, the second year $125,000, the third year $150,000, and the fourth and subsequent years $175,000 each. The agreement, by its terms, was not applicable to broadcasts over Radio Station WOR in New York, or to live broadcasts over any station, and was signed in behalf of C. F. Productions, Inc. by Robert Dave Nathan and Lawrence R. Curtis. Curtis was then president of Curtis Advertising Co., Inc., the advertising agency for Foods Plus. In Curtis Advertising Co., Inc. orders of November 11, 1960, May 3, 1961 and May 18, 1961, respectively, to Radio Station KLZ, Denver, Colorado, for advertising Foods Plus vitamins, it is stated that "It is firmly understood that no Foods Plus commercials will be heard within the body of the Carlton Fredericks Show" and that "This contract [for broadcasting, is] only valid as long as KLZ carries the Carlton Fredericks Show." Each of these orders contained the further instructions that "All mail received for Foods Plus is to be sent to Foods Plus, 62 West 45th Street, New York, N. Y. Att: Milton Rosenfeld. A daily count [is] to be sent to the above [Curtis] Agency." Similar directions and provisions are contained in an order to Radio Station KGMC, Englewood, Colorado, dated March 2, 1962 by the advertising agency of Roberts and Rogers, Inc., a wholly owned subsidiary of Foods Plus. I find, from the foregoing evidence, that Foods Plus adopted Carlton Fredericks' programs, and his claims for vitamins as efficacious for the prevention and treatment of human disease, as its own representations, and that claimant intended its products to be used for the purposes recommended by Fredericks, i. e., for the cure, mitigation, treatment, or prevention of disease in man. Because constituents of all the articles seized were similarly treated by Fredericks at some time during his close relationship with Foods Plus, I also find that all of the articles seized were drugs.

The remaining issue is whether the labeling of the seized articles satisfied the required "adequate directions for use." This phrase has been considered by the courts before and an excellent explanation of its meaning is included in United States v. Various Quantities of Articles of Drug, etc., D.C.D.C.1949, 83 F.Supp. 882, at page 885, as follows:

"The words, 'adequate directions for use,' necessarily relate to some purpose which is to be served by the use, and that purpose must be consistent with the intent of the Act as a whole to protect the public health. For what purpose are drugs used? Obviously, as a remedy for some ailment of the body. It seems equally obvious that no drug can be said to contain in its labeling adequate directions for its use, unless every ailment of the body for which it is, through any means, held out to the public as an efficacious remedy be listed in the labeling, together with instructions to the user concerning the quantity and frequency of dosage recommended for each particular ailment. * * * "

Another construction of the meaning of this statute is given in Alberty Foods Products v. United States, 9 Cir. 1952, 194 F.2d 463, 464:

"In order for the labeling of a drug to bear 'adequate directions for use' within the meaning of 21 U.S.C.A. § 352(f) (1) it must, among other things, state the purposes and conditions for which the drug was intended and sufficient information to enable a layman to intelligently and safely attempt self medication. * * * "

The relevant regulations under § 352 (f) (1) which were in effect at the time this seizure was made (January 30, 1962) are found at 21 C.F.R. 1.106(a) (1) and read:

> *"Drugs and devices; directions for use*
>
> "(a) Directions for use may be inadequate by reason (among other reasons) of omission, in whole or in part, or incorrect specification of:
>
>> "(1) Directions for use in all conditions for which such drug or device is prescribed, recommended, or suggested in its labeling, or in its advertising disseminated or sponsored by or on behalf of its manufacturer, packer, or distributor, or in such other conditions, if any there be for which such drug or device is commonly and effectively used."

All of these interpretations indicate that adequate directions within the meaning of the statute require at the very least a recitation of the diseases or conditions for which the drug is prescribed. Since the labeling of the seized articles did not contain this information the Government's case is complete.

The articles seized under the monition in this case are condemned for misbranding, and claimant will be enjoined in accordance with the Government's prayer for injunctive relief in the amended libel. Carlton Fredericks is not a party to this proceeding nor did he testify upon the trial. Moreover, his contract to promote the sale of claimant's products has been terminated. The scope of the injunctive relief to be granted to the Government in this case shall not, by its terms, extend to Carlton Fredericks or any of his activities.

This opinion shall constitute this Court's Findings of Fact and Conclusions of Law as required by F.R.Civ.P. 52(a).

Libelant may present a draft of decree conforming with the views herein expressed.