Don **HANSON** and Donna W. Schuster, Plaintiffs,

v.

**UNITED STATES of America et al., Defendants.**

No. 4–76–Civ. 11.

United States District Court, D. Minnesota, Fourth Division.

Feb. 20, 1976.

James Malcolm Williams, Minneapolis, Minn., for plaintiffs.

Daniel M. Scott, Asst. U. S. Atty., Minneapolis, Minn., for defendants.

## MEMORANDUM ORDER

LARSON, District Judge.

The plaintiffs in this civil action for injunctive and declaratory relief operate as a Shaklee Distributing Agency located in Rochester, Minnesota. Among the items which they are in the business of selling and distributing in interstate commerce is a product known variously as amygdalin, laetrile, or prunasin or "Vitamin B–17", which they receive from a manufacturer in Mexico in tablet and liquid form (vials), and which they in turn sell to the ultimate users of the product. The product is comprised of an extraction from the kernels of apricot pits. The complaint alleges that:

"[a]mong the dramatic effects of a diet rich in Vitamin B–17 is the prevention, control, arrest and minimization of cancerous tissue growths . . . ."

The defendants are the United States and various officers thereof responsible for the enforcement and administration of the Food, Drug, and Cosmetic Act, as amended. 21 U.S.C. §§ 301 *et seq.* They have taken the position that the laetrile tablets and vials which are being imported and distributed by the plaintiffs are "new drugs" within the meaning of 21 U.S.C. § 321(p), and that the plaintiffs' conduct is unlawful under 21 U.S.C. § 355(a) because the Food and Drug Administration [FDA] has not approved a new drug application with respect to the drug; indeed, say the defendants, no new drug application has ever been filed in accordance with 21 U.S.C. § 355(b). Because of their view that the importation and distribution of laetrile vials and tablets in interstate commerce is prohibited, Federal authorities obtained search warrants on December 23, 1975, for the plaintiffs' residences. Several items were seized in the execution of those warrants, including a quantity of the product laetrile. On January 9, 1976, the plaintiffs were indicted by the Grand Jury for the Southern District of California on charges of smuggling vials and tablets of laetrile, in violation of 18 U.S.C. §§ 371 and 545. That criminal prosecution is currently pending.

The plaintiffs do not deny that there is no approved new drug application with respect to the laetrile tablets and vials. They argue, however, that the tablets and vials are not a drug, are not "new drugs" within the meaning of the Act, and are not subject to restriction by the FDA. In this action, commenced on January 8, 1976, the plaintiffs seek injunctive relief along the following lines:

(1) An Order requiring that all items seized from the plaintiffs pursuant to the search warrants issued on December 23, 1975, be returned, and that no further search warrant be applied for against the plaintiffs without this Court's order.

(2) An Order enjoining all criminal prosecutions of whatsoever nature, for importing laetrile or selling it, and requiring this Court's authorization before any such proceeding may be commenced.

(3) A declaratory judgment that laetrile is a food, is not a new drug, is not prohibited in interstate commerce, is not harmful or toxic, that plaintiffs' source is not adulterated or mislabeled, and that the plaintiffs have the right to import it and the public has a right to use it.

(4) An Order decreeing that no agency of the United States has a right to interfere other than with reasonable import duties, enjoining any such interference, and retaining jurisdiction to assure that the duties so imposed are reasonable.

The plaintiffs sought a temporary restraining Order embodying the aforementioned relief, and such an Order was denied by this Court on January 15, 1976. Subsequently, various jurisdictional motions were filed by the defendants to dismiss the action against several or all of them.[1] Ordinarily, the Court would proceed first to jurisdictional issues as is the custom in the American judicial system. *Cf. Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Turbak v. Haines,* No. 4–75–Civil 42 (D.Minn. December 31, 1975) at Slip Op. 2. Counsel for the plaintiffs has urged, however, that immediate relief in this action is of such extraordinary importance and that the wrongdoing of the defendants is so patently obvious, that the Court should first accord to the plaintiffs a full opportunity for a hearing on the re-

---

1. Defendants Levi, Knoepp, Hoffman, Simon, and Acree contend that the Court lacks personal jurisdiction over them and that venue is improper in this District. The above named defendants and defendant Mathews urge that the Court lacks subject matter jurisdiction over any claims with respect to them. Defendants United States, Mathews, Simon and Acree urge that the complaint fails to state a claim for which relief can be granted against them. In light of the Court's ruling denying the preliminary injunction, these arguments may be fully considered at a later time.

quest for a preliminary injunction. Such a hearing was held on January 30, 1976, at which time the plaintiffs presented testimony through several witnesses and introduced numerous documentary exhibits. For the reasons set forth herein, the motion for a preliminary injunction will be denied.

■ The first category of relief sought by the plaintiffs—the return of the items seized in execution of the December 23, 1975, search warrants—must be rejected on the authority of Chief Judge Devitt's Order of January 28, 1976, in *United States v. 1617 Fourth Avenue Southwest,* D.Minn., 406 F.Supp. 527, 1–76–Mag–1. That Order was in response to the motion of the plaintiffs herein pursuant to Federal Rule of Criminal Procedure 41(e) for return of the seized property. Judge Devitt refused to rule on their motion, reasoning that the plaintiffs have an adequate remedy in the trial court in the Southern District of California, pursuant to Rule 12. This Court subscribes to that reasoning, and will not create a third method for obtaining the return of seized property in circumvention of the Order of the Chief Judge in this District.

■ The second category of relief sought by the plaintiffs—the enjoining of criminal prosecution by the defendants—must be denied on the authority of the general rule that equity will not act to restrain a criminal prosecution when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. *See O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Roe v. Wade,* 410 U.S. 113, 126, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Younger v. Harris,* 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 96 L.Ed. 138 (1951); *Douglas v. City of Jeannette,* 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); *Ripley v. Stidd,* 308 F.Supp. 854, 857 (D.Minn.1970); *Alexander v. Zimpfer,* No. 4–69–Civil 405 (D.Minn.1969), *aff'd per curiam,* 431 F.2d 704 (8th Cir. 1970). The plaintiffs seek to avoid this rule by alleging in their complaint that the defendants are engaging in a course of bad faith and harassment. *See Dombrowski v. Pfister,* 380 U.S. 479, 88 S.Ct. 1116, 14 L.Ed.2d 22 (1965). This allegation is insufficient to trigger the *Dombrowski* exception to the rule of equitable restraint in light of this Court's conclusion, set forth below, that the plaintiffs have failed to show a substantial probability of success on the merits of their claim that laetrile tablets and liquid cannot be regulated by the FDA.

The plaintiffs' right to a preliminary injunction along the lines sought in the third and fourth categories of relief is dependent on their showing of a substantial probability of success concerning their claim that the FDA has no power to regulate the importation, distribution in interstate commerce, and sale of laetrile tablets and liquid. The relief will be denied because the Court concludes on the basis of all the evidence that the plaintiffs have not made such a showing.

■ The plaintiffs have not shown a substantial probability of success with respect to their claim that laetrile tablets and liquid as sold by them are not "drugs" within the meaning of the Food, Drug, and Cosmetic Act. The word "drug" is defined in 21 U.S.C. § 321(g)(1) to include:

" . . . (B) articles *intended for use* in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals . . .." (emphasis supplied).

Countless court decisions emphasize that it is the *intended use* of an article which determines whether or not it is a "drug," and that even the most commonly ingested foods and liquids are "drugs" within the meaning of the Act if the intended use of such articles when distributed in interstate commerce falls within the definition of § 321(g)(1). *See, e. g., Kordel v. United States,* 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948) (compounds of minerals, vitamins, and herbs); *Seven Cases v. United States,* 239 U.S. 510, 518, 36 S.Ct. 190, 60 L.Ed. 411 (1916) (alcoholic solution); *United States v. Millpax, Inc.,* 313 F.2d 152, 153–54 (7th Cir. 1963), *cert. denied,* 373 U.S. 903, 83 S.Ct.

1291, 10 L.Ed.2d 198 (1963) ("iron tonic"); *United States v. Hohensee,* 243 F.2d 367 (3d Cir. 1957), *cert. denied,* 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136 (1957) ("health foods"); *Bradley v. United States,* 264 Fed. 79 (5th Cir. 1920) (mineral water); *United States v. Vitasafe Formula M,* 226 F.Supp. 266, 278 (D.N.J.1964), *remanded on other grounds,* 345 F.2d 864 (3d Cir. 1965), *cert. denied,* 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965) (vitamin and mineral capsules); *United States v. 250 Jars . . Fancy Pure Honey,* 218 F.Supp. 208, 211 (E.D.Mich.1963), *aff'd* 344 F.2d 288 (6th Cir. 1965) (honey); *United States v. 46 Cartons . . . Fairfax Cigarettes,* 113 F.Supp. 336, 338 (D.N.J.1953) (cigarettes). From these cases, it is apparent that the plaintiffs' argument that laetrile is a "vitamin" or a food does not preclude its being a drug if the tablets and vials at issue here are peddled for the intended uses set forth in the statute.

■ It is also well established that the "intended use" of a product, within the meaning of the Act, is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source. *See, e. g., United States v. An Article . . . Sudden Change,* 409 F.2d 734, 739 (2d Cir. 1969) (advertisements in various media); *United States v. Millpax, Inc., supra,* at 154–55 (letters and oral representations); *Nature Food Centres, Inc. v. United States,* 310 F.2d 67 (1st Cir. 1962), *cert. denied,* 371 U.S. 968, 83 S.Ct. 552, 9 L.Ed.2d 539 (1963) (speeches at public lecture hall); *V. E. Irons, Inc. v. United States,* 244 F.2d 34 (1st Cir.), *cert. denied,* 354 U.S. 923, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957) (statements of an authorized distributor); *United States v. Articles of Drug . . . Food Plus, Inc.,* 239 F.Supp. 465 (D.N.J.1965), *remanded on other grounds,* 362 F.2d 923 (3d Cir. 1966) (radio broadcast).

■ Tested against these standards, the evidence presented by both sides at this point in the action indicates overwhelmingly that the tablets and vials of laetrile at issue here are "drugs" within the meaning

of the Act. The complaint alleges that the ingestion of laetrile results in the "prevention, control, arrest and minimization of cancerous tissue growths." The promotional materials received by Ernest Neeth of the FDA from plaintiff Schuster and appended to his affidavit make similar claims. Counsel for plaintiffs has reminded this Court repeatedly that the plaintiffs believe that many people will die if they are deprived of the tablets and vials at issue here. Plaintiff Schuster testified that the importation of vials from Mexico is crucial because it is only in liquid form, through injections, that some patients can receive the massive doses (perhaps 9 to 20 grams per day) needed to treat their disease. In short, the use intended by these commercial distributors for their product is unquestionably the "diagnosis, cure, mitigation, treatment, or prevention of disease in man."

■ The plaintiffs have furthermore not shown a substantial probability of success with respect to their claim that laetrile is not a "new drug" within the meaning of the Act. Section 321(p)(1) defines "new drug" to include:

"(1) Any drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use . . . .."

In order to prevail on their contention that laetrile tablets and liquid are not "new drugs," the plaintiffs must establish either (1) that laetrile tablets and liquid are generally recognized as safe and effective by the proper experts; or (2) that the use of laetrile liquid and tablets predates the enact-

ment of § 321(p)(1) *and* that the labeling of such drugs at the earlier date contained the same representations as are now being made concerning the conditions of use. The plaintiffs have not demonstrated a substantial probability of success on either contention.

■ The only evidence presented by the plaintiffs to try to establish that their tablets and vials of laetrile are exempt under the "grandfather" clause of § 321(p)(1) consists of the 1896 edition of Merck's Index and hearsay concerning the use of amygdalin during historical times dating back to the ancient Egyptians. This evidence is patently insufficient to demonstrate that the exemption applies. Merck's Index contains no information about the intended use of amygdalin, providing only certain facts as to its physical appearance, melting point, and source. The only reference to the conditions of its use is the phrase "Keep well stoppered." There is no indication therein that amygdalin in tablet form or in liquid form was in use for any purpose whatsoever; there is certainly no indication that amygdalin liquid was being injected intravenously into human beings or that amygdalin tablets were being ingested by human beings. In short, there has been no showing by the plaintiffs that laetrile tablets or liquid were "subject to" the Act prior to the enactment of § 321(p)(1), and no showing that "at such time its labeling contained the same representations concerning the conditions of its use."

■ Nor have the plaintiffs presented evidence demonstrating the substantial probability that they will succeed in establishing that laetrile tablets and liquid are generally recognized as safe and effective by experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs. The defendants have submitted the sworn affidavits of three such experts to the effect that the drug is not so recognized. The plaintiffs have produced no such experts in sworn testimony, but have instead presented the Court with a blizzard of promotional materials, pamphlets, books, and articles urging the curative effects of laetrile. The authors of some of these exhibits are unknown and the credentials of others are not shown. Some do, however, purport to be the work of leading experts in the field. Yet, even if the Court assumes that every exhibit submitted by the plaintiffs was authored by an expert qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, the plaintiffs still fail to advance their cause, for the Court cannot find a single document claiming that laetrile tablets and vials are *generally recognized* as safe and effective for the treatment of cancer by experts in this country. Indeed plaintiff Schuster implicitly conceded that this burden of proof cannot be met. She testified that, to her knowledge, the great majority of doctors and other experts in the United States "do not believe in laetrile," and hence do not recognize it as safe and effective. Of the doctors and experts who believe that laetrile works, she testified: "It's a minority, that's for sure."

This Court's conclusion that the plaintiffs will not be able to establish that laetrile tablets and vials are not "new drugs" within the meaning of the Act, is supported by every reported case which has considered the matter. *See United States of America v. Spectro Foods Corp.,* No. 76–101 (D.N.J. January 28, 1976) at Slip Op. 7 ("the promotion or sale of amygdalin for any food or drug use constitutes a fraud on the consuming public"); *Rutherford v. United States,* 399 F.Supp. 1208 (W.D.Okl.1975); *United States v. General Research Laboratories,* 397 F.Supp. 197 (C.D.Calif.1975).

Section 355(a) of the Act provides that any new drug cannot be shipped in interstate commerce unless an approval of an application filed pursuant to § 355(b) is effective with respect to such a drug. Section 355(b) sets forth the requirements for a new drug application, including "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use." The affidavit of Carl M. Leventhal of the Bureau of Drugs establishes

that no new drug application for laetrile tablets or liquid has ever been on file at the FDA. Any distribution of laetrile tablets and vials in interstate commerce is therefore a violation of 21 U.S.C. § 355(a). Moreover, since no new drug application has ever been filed, there is no support for the plaintiffs' claim, set forth in the complaint, that the Secretary of Health, Education and Welfare has "illegally and unconstitutionally refused to declare the legitimacy of B–17." [2]

■ More fundamentally, as a jurisdictional matter, the District Courts have no role to play in determining whether a new drug should or should not be approved by the FDA. Congress has created primary jurisdiction in the FDA to determine in the first instance the safety and efficacy of a new drug, and this administrative determination is subject to review in the appropriate Court of Appeals under § 355(h). "The district court has neither the facilities nor the expertise to pass on [the new drug] in the first instance." *Tutoki v. Celebrezze,* 375 F.2d 105, 107 (7th Cir. 1967). *Accord, United States v. 1,048,000 Capsules,* 494 F.2d 1158, 1160 (5th Cir. 1974); *Israel v. Baxter Laboratories, Inc.,* 151 U.S.App.D.C. 101, 466 F.2d 272, 280 (1972); *Rutherford v. American Medical Association,* 379 F.2d 641, 643 (7th Cir. 1967), *cert. denied,* 389 U.S. 1043, 88 S.Ct. 787, 19 L.Ed.2d 835 (1968); *Lemmon Pharmacal Co. v. Richardson,* 319 F.Supp. 375, 377 (E.D.Pa.1970); *United States v. Articles . . . "Quick-O-Ver,"* 274 F.Supp. 443, 445 (D.Md.1967).

■ Underlying much of the argument by plaintiffs' counsel has been the notion that there is something unconstitutional about the system for new drug approval established by the Food, Drug, and Cosmetic Act. Reference has been made to *Ruth-erford v. United States, supra,* where Judge Bohanon of the District of Oklahoma concluded that it was unconstitutional to deny to a consumer of laetrile the opportunity to obtain it, because the consumer could not afford the costly procedures necessary to comply with § 355(b). However, unlike the plaintiff in that action, the plaintiffs herein are in the commercial business of selling the drug, and their counsel conceded during oral argument on the preliminary injunction motion that neither of the plaintiffs needs the drug. Nor do they allege anywhere in their complaint that they are unable to afford the new drug application procedures which must be complied with by every other commercial exploiter of a new drug.

The history of the Food, Drug, and Cosmetic Act in the courts demonstrates that there is no shortage of peddlers who claim that their miracle drug must be made available to the consuming public without further delay. A parallel history of product liability litigation also demonstrates the danger that new drugs may be released without adequate testing, too often with tragic consequences. The balance between these competing considerations is one which has already been struck by Congress, and it is one which has been repeatedly upheld by the courts. Only recently the Supreme Court reaffirmed this judgment in *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 622, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973):

" . . . Congress surely has great leeway in setting standards for releasing on the public, drugs which may well be miracles or, on the other hand, merely easy money-making schemes through use of fraudulent articles labeled in mysterious scientific dress. The standard of 'well-controlled investigations' particularized

2. The only evidence that any application of any kind has been submitted to the FDA with respect to laetrile is a reference in one of the promotional pamphlets to "McNaughton Foundation IND Application 6734 (April 1970)." Presumably, this refers to an application for permission to engage in experimental investigative use of laetrile on human subjects, pursuant to § 355(i). The exhibit offered by the plaintiffs in this respect gives no indication of what occurred with respect to that application, and the plaintiffs have offered no evidence to show that the application was improperly denied by the FDA. Even assuming that an IND application for laetrile was wrongfully denied, § 355(h) provides that appeals from such adverse rulings must be made directly to the appropriate Court of Appeals.

by the regulations is a protective measure designed to ferret out those drugs for which there is no affirmative, reliable evidence of effectiveness.    .    .    . "

IT IS ORDERED:

That the plaintiffs' motion for a preliminary injunction be, and is hereby, denied.