Glen L. RUTHERFORD, Individually and on behalf of a class composed of terminally ill cancer patients, Plaintiffs,

v.

UNITED STATES of America, Joseph A. Califano, Secretary of Health, Education and Welfare; Donald Kennedy, Commissioner of the Food and Drug Administration, et al., Defendants.

No. CIV–75–0218–B.

United States District Court,
W. D. Oklahoma.

Dec. 5, 1977.

See also, D.C., 424 F.Supp. 105, D.C., 429 F.Supp. 506.

Burton J. Johnson and Kenneth R. Coe of Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., for plaintiff class.

Paul Ragan, Associate Chief Counsel for Enforcement, Eugene M. Pfeifer, Associate Chief Counsel for Radiological Health, and Arnold I. Friede, Asst. Chief Counsel for Radiological Health, Food and Drug Administration, Rockville, Md., John E. Green, Acting U. S. Atty., and William S. Price, Asst. U. S. Atty., W. D. Okl., Oklahoma City, Okl., Julian C. Green, U. S. Customs Service, Houston, Tex., for defendants.

## OPINION

BOHANON, District Judge.

The plaintiffs seek judicial review of the Food and Drug Administration's (FDA's) determination that the substance commonly called Laetrile is a "new drug" within the meaning of the Federal Food, Drug, and Cosmetic Act, (the Act); (21 U.S.C. § 301 et seq.), and excludable from interstate commerce due to the absence of an approved new drug application on its behalf. (21 U.S.C. § 355).

On July 29, 1977, the Commissioner of Food and Drugs announced that: (1) Laetrile is not generally recognized by qualified experts as a safe and effective cancer drug and (2) Laetrile is not exempt from the pre-market approval requirement for new drugs by virtue of the "grandfather" provisions of the Act. Distribution of Laetrile in interstate commerce, the Commissioner concluded, is thus illegal and subject to regulatory activity by the Food and Drug Admin-

istration. Commissioner's Decision (R 523 at 1).[1]

Plaintiffs challenge such administrative decision and urge that Laetrile is not a "drug," that in any event it is not a "new drug," and that FDA's enforcement procedures against the interstate transportation and use of the substance violate plaintiffs' constitutional rights.

# I

## STANDARD OF REVIEW

▮ FDA possesses jurisdiction to initially determine whether a substance is a "new drug" within the Act's meaning, *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 627, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), but such determination is reviewable by the district court under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., *Weinberger, supra.* To be affirmed, the administrative decision must not be arbitrary, capricious or abusive of agency discretion.[2] *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court in its review must consider whether the decision was based upon a consideration of the relevant factors and whether there has been a clear error of judgment.[3] *Citizens to Preserve Overton Park v. Volpe, supra.*

▮ While the standard of review is narrow, and the court is not empowered to substitute its judgment for that of the agency, nonetheless, the reviewing court possesses a responsibility "to engage in a substantial inquiry," and "his inquiry into the facts is to be searching and careful . . . .." [4] *Citizens to Preserve Overton Park v. Volpe, supra* at 415–16, 91 S.Ct. at 824. Although the agency's decision is entitled to a presumption of regularity, this does not preclude a thorough, probing, in-depth review. *Citizens to Preserve Overton Park v. Volpe, supra* at 415, 91 S.Ct. 814.

▮ Meaningful judicial review requires determining that an agency's course of action flowed from a proper interpretation of the relevant law and a proper application of that law to facts sufficiently well developed by agency inquiry as to reflect the truth of the matter in controversy. The court should intervene where it appears from a combination of danger signals, that the agency really has not taken a "hard look" at the salient problems, and has not *genuinely* engaged in reasoned decision-making.[5]

1. In adopting the approach employed by FDA, submissions to the administrative record are designated by an R followed by the number assigned to them by the Hearing Clerk. References to the transcript of the oral argument are cited as Tr.

2. 5 U.S.C. § 706 states in part: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret *constitutional* and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall— . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .." (emphasis supplied)

3. The Tenth Circuit Court of Appeals has clearly established previously that Laetrile is not to be considered a "new drug" merely because the FDA has said so; the agency must proffer "substantial evidence" supportive of such determination. *Rutherford v. United States,* 542 F.2d 1137, 1143 (10th Cir. 1976). "Perhaps

agency action which is not based upon substantial evidence is arbitrary and capricious." *American Petroleum Institute v. EPA,* 540 F.2d 1023, 1028 (10th Cir. 1976).

4. A court may study the record, hopefully perceptively, even as to the evidence on technical and specialized matters, and penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion and has not deviated from or ignored the ascertainable legislative intent. This immersion in the evidence enables the court to determine whether the agency decision was rational and based on the relevant factors. *Ethyl Corp. v. Environmental Protection Agency,* 176 U.S.App.D.C. 373, 407–408, 541 F.2d 1, 35–36 (1976).

5. Considerable evidence calls into question FDA's sense of objectivity in this case.

When this suit was initiated, FDA had declared Laetrile a "new drug" without ever having constructed an administrative record in support of such designation. *See Rutherford v. United States,* 424 F.Supp. 105 (W.D.Okl.1977). Ideally, agency decisions and conclusions

*Greater Boston Television Corporation v. F.C.C.,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970).

The exercise of discretionary authority requires a decision based upon adequate information; to act without collecting necessary facts is abusive of discretion. *Xytex Corporation v. Schliemann,* 382 F.Supp. 50, 53 (D.Colo.1974).

After collecting the facts, the appropriate legal standards must be applied.[6] If administrative construction of a statute is clearly wrong, it is the court's duty to correct.[7] *R. V. McGinnis Theatres and Pay T.V. v. Video Independent Theaters,* 386 F.2d 592, 594 (10th Cir. 1967), *cert. denied,* 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968). Administrative regulations must be consistent with the statute's purposes and reasonably adapted to carry out those pur-

poses. *Greyhound Corporation v. United States,* 221 F.Supp. 440, 444 (N.D.Ill.1963).

Having reviewed the Decision of the Commissioner of Food and Drugs on Laetrile, dated July 29, 1977, (42 Fed.Reg. 39768–39806 (1977)), and the entire administrative record upon which that decision was based, and the pleadings and briefs, the court concludes that such decision is arbitrary, capricious, that it represents an abuse of discretion and is not in accordance with law. Consequently, it must be set aside and vacated. 5 U.S.C. § 706(2).

## ISSUES

The following issues are presented:

1. Is Laetrile a drug?

2. Is Laetrile a "new drug" within the meaning of § 201(p) of the Federal

should flow from a probing and objective analysis of a carefully amassed and encompassing factual record. When ordered on remand to conduct an appropriate investigation, FDA begrudgingly announced its intentions to do so and then previous to ever having received the evidence on which its conclusions are ostensibly based, FDA reaffirmed its same, entrenched positions on the salient issues in the case. *See* "Laetrile—Notice of Administrative Rule Making Hearing," (R 1) (42 Fed.Reg. 10066 (1977)). Understandably, many contributors to the administrative record expressed skepticism concerning the proceedings' fairness.

6. "When an administrative officer is sitting in a dual role as judge of the law and trier of the facts, and when he, as judge, gives himself, as fact-finder, an incorrect instruction as to the law governing the decision he must make, error is committed just as there is error if a judge incorrectly charges a jury. We must assume that the examiner applied the standard as he stated it; and if he did, he erred, and on a question of law. The decision, therefore, cannot stand." *Williams v. Ribicoff,* 323 F.2d 231–32 (5th Cir. 1963).

7. FDA errs as a matter of law when it asserts that Laetrile cannot escape new drug classification unless it is shown that: "It is currently intended *solely* for use under conditions prescribed recommended or suggested in its labeling on October 9, 1962." (emphasis supplied) Under this interpretation, if someone were suddenly to begin promoting aspirin for some new or unconventional purpose, all aspirin, regardless of its use, would ipso facto be subject to being classified a "new drug" and regulated as

such under the provisions of the Act. The appropriate statutory construction requires that Laetrile be considered exempt from "new drug" status *to the extent* that it is currently being used for the same purposes and under the same conditions and labeling as on October 9, 1962. The Act says that the 1962 "new drug" amendments "shall not apply to . . . [drugs] *when intended* solely for use under conditions prescribed [October 9, 1962] . . ." (emphasis supplied) Pub.L. No. 87–781 § 107(c)(4) (1962) *reprinted at* 21 U.S.C. § 321, n.

The term "labeling" is defined in the Act to include not only "all labels" but also "other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article. (21 U.S.C. § 321(m)) This definition has been given a broad interpretation, *see e. g. Kordel v. United States,* 355 U.S. 345, 347–50, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *United States v. Urbuteit,* 335 U.S. 355, 357, 69 S.Ct. 112, 93 L.Ed. 61 (1948). Commissioner's Decision (R 523 at 143).

1962 labeling characterizes Laetrile as a palliative agent for use in "cancers beyond aid by standard agents," and warns that "it is not to be employed to the exclusion of surgery, radiation or similar standard modalities so long as they are indicated." Affidavit of Robert S. K. Young, Ph.D. (R 201 at H234) If "generally recognized as safe" by qualified experts, the "1962 grandfather clause" prevents Laetrile from being classified or treated as a "new drug" when labeled in substantially the same manner as previous to October 10, 1962. *See* the "1962 Grandfather Clause" Issue, p. 9.

Food, Drug and Cosmetic Act (21 U.S.C. § 321(p) in that it is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use in the cure, mitigation, treatment, or prevention of cancer in man, and in that it is not "grandfathered" by one of the Act's provisions applicable to those drugs marketed before the current "new drug" statutory provision became effective?

3. Is the agency action in question violative of plaintiffs' constitutional rights?

## II

### NEW DRUG ISSUE

FDA asserts authority to preclude Laetrile's importation or interstate transportation on the basis that it is a "new drug" within the Act's meaning. "No person shall introduce or deliver for introduction into interstate commerce any new drug," unless an application on its behalf has been approved. 21 U.S.C. § 355(a). It is conceded that no such application in regard to Laetrile has been approved, but plaintiffs challenge the Commissioner's categorization of Laetrile as a "new drug."

■ Plaintiffs initially question the determination that Laetrile is a drug, contending instead that it is a vitamin or food. "Drug" is defined to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals . . . ." 21 U.S.C. § 321(g)(1)(B). The court need not rule whether Laetrile is a food or a vitamin, since, in any event, its well-recognized use in the treatment of cancer renders it a drug within the context of the statutory definition.[8]

## III

### THE "GENERALLY RECOGNIZED . . . AS SAFE AND EFFECTIVE" ISSUE

If Laetrile's composition is such that it is generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use in the treatment of cancer, it is not a "new drug" within the Act's meaning and not subject to the asserted FDA regulation. 21 U.S.C. § 321(p)(1).

Unquestionably, the administrative record in this case reveals a substantial and well-developed controversy among medical professionals and other scientists as to the efficacy of Laetrile.

Advocates of Laetrile's use in cancer treatment include many highly educated and prominent doctors and scientists[9]

---

8. Numerous court decisions have emphasized that it is the intended use of an article which determines whether or not it is a "drug" and that even the most commonly ingested foods and liquids are "drugs" within the meaning of the Act if their intended use when distributed in interstate commerce falls within the definition of § 321(g)(1). *See e. g. Bradley v. United States,* 264 F. 79 (5th Cir. 1920) (mineral water); *United States v. "Vitasafe Formula M,"* 226 F.Supp. 266, 278 (D.N.J.1964) *remanded on other grounds,* 345 F.2d 864 (3rd Cir. 1965) *cert. denied,* 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965) (vitamin and mineral capsules); *United States v. 250 Jars . . . Fancy Pure Honey,* 218 F.Supp. 208, 211 (E.D. Mich.1963) *affirmed,* 344 F.2d 288 (6th Cir. 1965) (honey); *United States v. 46 Cartons, etc.,* 113 F.Supp. 336, 338 (D.N.J.1953) (cigarettes); *United States v. Research Laboratories, 126 F.2d 42 (9th Cir. 1942) cert. denied,* 317 U.S. 656, 63 S.Ct. 54, 87 L.Ed. 528 (1942); *Hanson v. United States,* 417 F.Supp. 30 (D.Minn.1976) (Laetrile); *United States v. Article Consisting of 36 Boxes, etc.,* 284 F.Supp. 107 (D.Del.1968) *affirmed,* 415 F.2d 369 (3rd Cir. 1969); *United States v. 3 Cartons, etc.,* 132 F.Supp. 569, 573 (S.D.Cal.1952).

9. Proponents of the use of Laetrile include: Dean Burk, Ph.D., in biochemistry from the University of California. A research scientist possessing 35 years' experience with the National Cancer Institute, Dr. Burk is the former head of the Institute's Cytochemistry Section. (R 302; Tr. 401).

Charles Gurchot, Ph.D., in chemistry and physiology from Cornell University, former assistant professor of pharmacology, University

whose familiarity and practical experience with the substance vastly exceeds that of their detractors. To deem such advocacy "quackery" distorts the serious issues posed by Laetrile's prominence and requires disregarding considerable expertise mustered on the drug's behalf.

While the record reveals an impressive consensus among the nation's large medical and cancer-fighting institutions as to Laetrile's ineffectualness, a disconcerting dearth of actual experience with the substance by such detractors is revealed.

■ Special problems, medical, legal and philosophical, arise when applying the "generally recognized as safe and effective" standards of the Act to drugs employed in the treatment of cancer. There are many thousands of terminally ill cancer patients each year whose diseases have progressed to a point where, for them, no drug exists which can fairly be termed "generally recognized as safe and effective." These are the persons who have been told they are beyond help and have been sent home to die. Should further treatment of these peo-

ple be precluded by the Act? Certainly not. Individuals for whom no orthodox cure is available surely are entitled to select a health-care approach with which they feel compatible.[10]

■ Nonetheless, while Laetrile's use in cancer treatment is widespread, its efficacy may, for statutory purposes, be inadequately documented. A drug can be "generally recognized" by experts as effective for intended use within the meaning of the Act only when that expert concensus is founded upon "substantial evidence" as defined in § 505(d), 21 U.S.C. § 355(d). *Weinberger v. Hynson, Westcott & Dunning, supra,* 412 U.S. at 632, 93 S.Ct. 2469.[11]

■ The current debate is fierce. The issue appears largely unresolved as to Laetrile's true effectiveness, in large part because FDA has prevented adequate testing on humans. Nevertheless, the evidence of record does not render the Commissioner's conclusion that Laetrile is not "generally recognized as safe and effective" arbitrary and capricious.

---

of California Medical School at San Francisco. (R 302 at J–206).

Chauncey D. Leake, Ph.D., former associate professor of pharmacology at University of Wisconsin. (R 302 at J–200).

Raymond Ewell, Ph.D., in chemistry from Princeton. (R 302 at J–196).

Phillip Binzel, M.D., (Tr. 360); John A. Richardson, M.D. (R 510, Ex. 1 and Tr. 462); The Honorable Lawrence P. McDonald, M.D., Congressional Representative from the State of Georgia (R 509); Ernst T. Krebs, Sr., M.D., and Dr. Ernst T. Krebs, Jr., (Tr. 228); perhaps as many as 600 American M.D.'s or more have employed and are advocating the use of Laetrile in cancer treatment. (R 313 at J–255).

David Rubin, M.D., surgeon at Beilinson Hospital and cancer researcher at Hadassah Hospital in Jerusalem, Israel. (R 510, Ex. 12).

Mario A. Soto, M.D., of Mexico, authorized by the National Cancer Institute to conduct independent investigational studies with the Institute's cancer drugs. (R 286; Tr. 478).

Hans A. Nieper, M.D., Hannover, West Germany; Ernesto Contreras, M.D., Tijuana, Mexico; Shigeaki Sakai, M.D., of Tokyo, Japan; Etore Guidetti, M.D., Brazil. (R 507).

Many doctors testify that Laetrile can confer an "improved quality of life" even upon patients who ultimately die, by reducing their

pain and discomfort. For example, see P. E. Binzel, Jr., M.D., (Tr. 362); David Rubin, M.D. (R 510, Ex. 12).

10. Not all members of America's leading cancer institutions are unalterably opposed in all contexts to Laetrile's use. "I have stated before, . . . that if the patient has exhausted the benefits of conventional treatment and does not mind the financial outlay, I see no harm in his taking Amygdalin in the way it has generally been used." Affidavit of C. Chester, Ph.D., vice-president and associate director for administrative and academic affairs of the Sloan-Kettering Institute for Cancer Research, New York. (R 195).

11. "[T]he term 'substantial evidence' means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed . . . ." 21 U.S.C. § 355(d).

Significantly, however, a drug not recognized as safe and effective still "shall not be deemed to be a 'new drug' if at any time prior to [this] enactment [October 10, 1962] . . . it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use . . . ." 21 U.S.C. § 321(p)(1).[12]

Many believe that simply administering Laetrile to tumor-bearing mice, particularly when the results of such tests are so much in controversy,[13] is not dispositive of the issue. Laetrile proponents often submit that it should be utilized in conjunction with a dietary regimen essential to the drug's success.[14] Significantly, animal testing sheds little light on the placebo effect, that is, the healing effect accompanying the psychological uplight and renewed sense of hope which often attends administration of

a substance in which a patient strongly believes.[15] It is only when the substance is openly used, and its results carefully observed and fully reported that this controversy will be resolved.

## IV

## THE "1962 GRANDFATHER CLAUSE" ISSUE

 If on October 9, 1962, Laetrile was marketed for the same uses for which it is presently being sold and if generally recognized by qualified experts as safe for those uses, the grandfather clause exempts it from the test of general recognition by experts as being both safe and effective for its claimed uses. *Rutherford v. United States,* 542 F.2d 1137 (10th Cir. 1976) *supra; Tyler Pharmacal Distributors, Inc. v. United States Department of HEW,* 408 F.2d 95, 99 (7th Cir. 1969).[16]

12. "The effect of this definition is that there is a twofold grandfather clause exemption which is capable of removing Laetrile from the new drug category even if it is not recognized by the experts as being safe and effective which, by the way, does not say that it is unsafe and ineffective. The first of these grandfather exemptions comes from transitional provisions attached to the 1962 Amendments to the Food, Drug and Cosmetic Act of 1938. The second grandfather exemption arises from provisions attached to the 1938 Act when it superseded the original Food and Drug Act of 1906." *Rutherford v. United States,* 542 F.2d 1137, 1141 (10th Cir. 1976).

13. Knowledgable experts have expressed sharp criticism of certain prominent Laetrile tests on animals in which the substance was determined ineffective. Note the analyses of Dr. Bernard Kenton of the City of Hope National Medical Center, Los Angeles, California. (R 507 at N249); and Dr. Dean Burk (R 302 at J–117) also those of Dr. Michael Fox, chairman of the Biomathematics Department of the City of Hope National Medical Center, and assistant professor of biomathematics at UCLA, and Harold Hornsby, research scientist with NASA and a Fellow of the Royal Statistical Society in London (R 313 at J–253 and 254). Sloan-Kettering researcher Dr. Kanematso Sugiura performed at least six different tests in which he concluded that Laetrile was effective in combatting certain types of tumors; the Institute subsequently released other test results reportedly contradicting Dr. Sugiura's findings. Dr. Sugiura is quoted as saying: "It is still my

belief that amygdalin cures metastases." (R 313 at J–241).

14. "I know of no doctor throughout the world who is now using Amygdalin who does not agree that the maximum benefit from Amygdalin is obtained when it is used in combination with other vitamins, enzymes and proper diet." P. E. Binzel, Jr., M.D. (Tr. 363).

15. "Humans are very susceptible, particularly when ill and desperate with hope to the power of positive suggestion—namely, when given a 'drug' by an authority figure (e. g. a physician) with the firm statement and promise they will now begin to feel better, to have pain relief, to eat better, and to get well, these hopeful patients frequently do just what they have been told to expect. This effect has long been recognized in medicine and is termed 'placebo effect.'" Affidavit of Daniel S. Martin, M.D. (R 185 at 7). One noted expert argues: ". . . the only way to achieve the placebo effect, itself, is for some authority to indicate that the drug could be effective. There is no official, no ethical way to do that." R. Lee Clark, M.D., president of the American Cancer Society. (R 307 at J–228). The record clearly reveals, however, that many doctors are convinced that Laetrile is capable of playing a legitimate and significant role in the treatment of cancer, and are perfectly willing to administer it on that basis. *See* n. 6.

16. "One of the transitional provisions enacted in 1962 was as follows:

'In the case of any drug which, on the day immediately preceding the enactment date

Based upon FDA's own administrative record in this case and the applicable statutes and case law, the court concludes that the agency's classification of Laetrile [17] as a "new drug" is "arbitrary, capricious, an abuse of discretion" and as a matter of law unsupportable. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. 814; 5 U.S.C. § 706(2)(A).

> (October 10, 1962), (A) was commercially used or sold in the United States, (B) was not a new drug as defined by Section 201(p) of the basic Act as then in force (21 U.S.C. Section 321(p)), and (C) was not covered by an effective (new drug) application under 505 of that Act (21 U.S.C. Section 355), the amendments to Section 201(p) made by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day. Pub.L. 87–781, Section 107(c)(4), reprinted at 21 U.S.C. Section 321 note.'" *Rutherford v. United States,* (10th Cir. 1976 *supra,* 542 F.2d at 1141.)

17. The Commissioner's report concludes that the terms "Laetrile" and "Amygdalin" do not refer to the same substance and cannot be used interchangeably. Such report assigned to Amygdalin the chemical formula of D-mandelonitrile-beta-D-glucoside-6-beta-D-glucoside, while assigning to Laetrile, on the basis of a formula derived by Dr. Ernst T. Krebs, Jr., the designation 1-mandelonitrile-beta-glucoronic acid. The record reveals that the latter formula has reference to a theoretical model that Krebs developed but apparently either never synthesized or never chose to employ to any material extent. (R 183) The substance in controversy in this case, and with which this opinion is concerned, is described by the first formula; as recognized by the Commissioner, Laetrile's proponents and opponents alike refer to the substance both as "Amygdalin" and "Laetrile." Such substance is that same Amygdalin or Laetrile to which the Commissioner made reference in his "Laetrile—Notice of Administrative Rule Making Hearing" (42 Fed.Reg. 10066 (1977)) when he stated: "Laetrile is the name of a product whose major component or ingredient is the chemical amygdalin, a substance that occurs naturally in the pits of apricots, peaches, bitter almonds and in other plant material . . ." and it ". . . has been known, tested, and used [as a cancer remedy] for more than 25 years . . . ." Numerous judicial determinations have been made equating Laetrile and Amygdalin. *See United States v. Spectro Foods, Corp.,* Civ–76–101, (Dist.N.J.1976) *affirmed in part reversed in part,* 544 F.2d 1175 (3rd Cir. 1976); *United States v. General Research Laboratories,* 397

■ The record and the law reasonably support but one conclusion: Laetrile (Amygdalin) has been commercially used and sold in the United States for the treatment of cancer for well in excess of 25 years, during which time it has been "generally recognized" by qualified experts as safe [18] for such use.

F.Supp. 197 (C.D.Cal.1975); *Rutherford v. United States,* 399 F.Supp. 1208, 1211 (W.D. Okl.1975), 424 F.Supp. 105–06 (W.D.Okl.1977).

The administrative record clearly establishes that Laetrile and Amygdalin are equivalent and have been recognized as such for over 20 years. The American Cancer Society, in a pamphlet entitled "Questions Most Frequently Asked About 'Laetrile'," answered in response to the question, "What is Laetrile?": "The scientific name of the drug is amygdalin; 'Laetrile' is a registered trade mark." (R 173 at 144D) Frank J. Rauscher, Jr., Ph.D., Director of the National Cancer Program for the National Cancer Institute equates Laetrile with Amygdalin in his "Statement Concerning Laetrile." (R 173 at 222D) So too does Dean Burk, Ph.D., former head of the Cytochemistry Section of the National Cancer Institute (R 302 at J–60, J–71); Raymond Ewell, Ph.D., former professor of chemistry at the State University of New York at Buffalo (R 302 at J–196); Thomas H. Jukes, Ph.D., professor in residence in medical physics and research biochemist, University of California at Berkeley. (R 416 at M–77–78).

The affidavit of W. Sherwood Lawrence, M.D., a medical officer of the Department of Health of the State of California, the Executive Secretary of the State of California Cancer Advisory Council, and a Laetrile opponent, clearly establishes Laetrile and Amygdalin as being one and the same. (R 183).

Numerous "official samples" of Laetrile collected by the State of California over a period of years and chemically analyzed have established the substance as Amygdalin. Analysis by the AMA of the Laetrile employed by the originators of the term, Drs. Ernst T. Krebs, Sr. and Jr., determined the substance to be Amygdalin, as did the 1953 report on Laetrile by the Cancer Commission of the California Medical Association. The report stated: "Chemical analyses done independently for the Commission have identified in the product distributed as Laetrile only the presence of a natural Laetrile termed Amygdalin." (R 183 at 29F) The testimony of both Drs. Krebs also clearly establishes this fact. (R 183 at 196F; Tr. 228).

18. The issue of Laetrile's *safety* possesses several different facets. FDA contends that even if Laetrile were marketed prior to 1962 it must be shown to have been "effective" as well as

Amygdalin was reportedly first isolated from bitter almonds by the French Chemists Robiquet and Burton-Charland in 1830. The name "Amygdalin" was derived from the word "Amygdala," Greek for almond. Commissioner's Decision. (R 523 at 23).

Reports of its employment in the treatment of cancer were first published in 1845 and 1846.[19]

"safe" since it was used in the treatment of a "life-threatening disease," cancer, and thus was not safe if ineffective. Commissioner's Decision (R 523 at 189). Such legal premise could be extended to abrogate all distinction between the terms "safe" and "effective" and is unmeritorious; any ineffective remedy may displace an effective one, regardless of the disease's severity, and in that sense is unsafe. The Supreme Court in *Weinberger v. Hynson, supra,* stated that "the 1962 amendments [of the Food, Drug and Cosmetic Act] *for the first time* gave FDA power to scrutinize and evaluate drugs for *effectiveness as well as safety."* 412 U.S. 630, 93 S.Ct. 2483 (emphases supplied). In any event, FDA's argument "may lose its force in the case of a terminally-ill patient *or* in the case of a patient suffering from a disease for which there are no 'effective' remedies." *Rutherford v. United States,* (10th Cir. 1976), *supra,* n. 5, 542 F.2d at 1142. FDA erred as a matter of law when it determined that a cancer drug cannot be "grandfathered" on the basis of pre-1962 use unless shown to be effective as well as safe. As to the danger that Laetrile's use results in postponement of conventional treatments to the patient's detriment, it is to be noted that outlawing Laetrile has not resulted in disuse but merely in large numbers of Americans traveling to Mexico. It has been estimated that each year 20,000 Americans afflicted with cancer travel to Mexico to receive Laetrile treatments. (R 313 at J–242) Thus Laetrile's illegality actually tends to remove many patients from the care of their American doctors.

As to selecting Laetrile over orthodoxy, the record discloses that the vast majority of Laetrile patients first underwent the relevant conventional treatments. While isolated, tragic instances may have occurred in which Laetrile was used and conventional treatments avoided, to a patient's detriment, such persons might well have opposed orthodox approaches and remained untreated even were Laetrile unavailable.

Too, Laetrile may be administered either parenterally or orally; the latter method, some contend, is more dangerous than the former. While the record discloses certain differences of opinion on this issue, the vast amount of practical experience of actual experimenters and users, in administering Laetrile both paren-

In 1949 doctors utilizing Amygdalin as a cancer treatment in the United States coined the term "Laetrile."[20]

Extensive use of the substance, its commercial availability,[21] and its recognition as being safe, all previous to 1962, are well-documented in the record.

Any restrictions placed on the commercial availability or use of Laetrile by FDA preterally and orally, has established its nontoxicity. *See* n. 15; *also see* Tr. 311. One journalist reports that 50,000 American cancer patients are currently using over 1 million grams of Laetrile per month. (R 507).

19. J. D. Inosemtzoff, M.D., in *Gazette Medicale de Paris,* No. 37 September 13, 1845, pp. 577–582; *Journal Chirurgie/Augenheilkunde* 1846. (R 302, Ex. A, at J–65).

20. "In 1949, my son, Ernst T. Krebs, Jr. gave the name Laetrile to the Amygdalin I was producing and I have used the name of Laetrile ever since that time for the final form of the Amygdalin which I produce." Affidavit of Ernst T. Krebs, Sr., M.D. (Apr. 1965) (R 183 at 196F).

21. "Use of a drug is investigational, as contrasted with commercial, when that use is for the purpose of determining whether, or demonstrating that, the drug in question is safe and effective." Commissioner's Decision. (R 523 at 168).

While the record reveals many instances of investigational use of Laetrile, extensive use of the substance as a part of various doctors' fundamental regimen in treating cancer is also demonstrated.

The record's whole tenor reasonably establishes the commercial availability of Laetrile (Amygdalin) during the period in question. As noted earlier, the substance was extracted well over a century ago and has long been pharmaceutically recognized. "Of my own personal knowledge, I know that both prior and subsequent to 1938 amygdalin was readily available to anyone who wanted it from United States suppliers of chemicals . . . [and that] amygdalin was listed and is still listed, as a purchasable item in various chemical catalogs published in the United States." Charles Gurchot, Ph.D. in chemistry. (R 302 at J–211).

Several documents in the record allude to a controversy in California in the early 1950's over variations in the price of Laetrile (Amygdalin) among sellers. (R 183 at 105F–111F) Note for example the letter from N. Schneider of Van, Waters & Rogers, Inc., which clearly establishes the commercial availability of Amygdalin between 1952 and 1964. (R 183 at 108F).

vious to July 29, 1977, when the administrative record and Commissioner's Decision were filed, were unsupported by any competent administrative record whatsoever and subject to attack as a matter of law.[22]

**22.** See Rutherford v. United States (10th Cir. 1976), 542 F.2d 1137 supra; Rutherford v. United States, 424 F.Supp. 105 (W.D.Okl.1977); and the record from the December 30, 1976, "Hearing to Implement Tenth Circuit Court Ruling" pp. 13–14.

**23.** In the only laboratory study of record specifically designed to determine the drug's toxicity, it was observed: "Amygdalin, at all doses studied, appears to be completely non-toxic in laboratory mice." Harold W. Manner, Ph.D., Chairman, Department of Biology, Loyola University, Chicago, Illinois (R 262). Of the various controversial tests studying Laetrile's efficacy on animal tumors, none have disclosed toxicity at reasonable dosage levels.

Among the numerous scientists and physicians testifying from first-hand experience with Laetrile and its effect on humans, unanimity exists as to its nontoxicity.

Dr. Phillip Binzel, M.D., graduate of St. Louis University, testified that he has personally given nearly 4,000 intravenous injections of Amygdalin using doses up to 9 grams without any adverse reaction. (Tr. 363).

Daniel S. Martin, M.D., who participated in the same Sloan-Kettering experiments in which Dr. Sugiura detected cancer inhibiting properties in Laetrile, and who disputed Dr. Sugiura's results, nonetheless concluded that there was no doubt that Laetrile was nontoxic, at least if administered parenterally. (Tr. 437).

Charles Gurchot, Ph.D., testified for the record in affidavit form that Amygdalin in liquid and solid form was used prior to 1962 (between 1934 and 1945) by Gurchot, under the supervision of five named medical doctors at the University of California Medical School at San Francisco. This Amygdalin was, according to his statement, administered "on patients intramuscularly and intravenously." He further stated that during this same period Amygdalin was being used to his personal knowledge by approximately a dozen California physicians in their treatment of cancer. Gurchot expressed his belief that Amygdalin was generally recognized by experts as being safe for use in the treatment of cancer on or prior to October 10, 1962. (R 302 at J–206).

Chauncey D. Leake, Ph.D., indicated in his affidavit that he is familiar with Dr. Gurchot's use of Amygdalin in the mid 1930's and 1940's at the University of California Medical School Hospital in San Francisco. He further indicates that physicians and other scientists familiar with Amygdalin recognized it as safe at that time. (R 302 at J–200).

The administrative record brooks little real controversy as to Laetrile's nontoxicity, particularly when administered parenterally, even at doses greatly exceeding amounts normally ingested.[23]

Dr. Dean Burk, former head of the Cytochemistry Section, National Cancer Institute, Bethesda, Maryland, after testing Amygdalin on rats, says the substance is "notably less toxic to animal organisms than ordinary diet sugar," and that aspirin tablets are 20 times more toxic than an equivalent amount of Amygdalin. (R 183 at 166F).

"Investigators have found that intravenous doses in excess of 20 grams have been without toxic effect in healthy human subjects, although occasionally a mild hypotensive effect may be observed. Repeatedly, studies have indicated that pure Amygdalin, when administered parenterally is astonishingly devoid of toxic effects." (R 183 at 166F).

Donald C. Thompson, M.D., of Morristown, Tennessee, testified as to his personal experience with administering Laetrile to patients and affirmed the drug's nontoxicity. (R 515).

In his report entitled "Use of Laetrile in the Prevention and Treatment of Cancer," Dr. David Rubin, M.D., surgeon at Beilinson Hospital and cancer researcher at Hadassah Hospital in Jerusalem, Israel, asserts: "Laetrile is nontoxic even in very large injected doses." (R 510, Ex. 12).

As another example of a practicing physician who has extensively used Amygdalin and determined it to be nontoxic, see the letter of The Honorable Lawrence P. McDonald, Congressional Representative from Georgia. (R 509 at N265–68).

"Amygdalin (Laetrile) is totally non-toxic systemically, at commonly applied dosages." Hans A. Nieper, M.D., Hannover, West Germany. (R 302 at J–180).

While a doctor's inability to control many variables potentially relevant to curing a disease may impugn the credibility of his perceptions as to a drug's efficacy (see Weinberger v. Hynson, supra) his observations as to its toxicity are much more reliable, since the relevant variables are more manageable.

"(Laetrile) is totally nontoxic. Its lethal dose in mice and rats, by injection, is about 25,000 miligrams per kilogram of body weight. It is so nearly nontoxic that in some studies the water, used as a dilutant presents a greater toxicity than the vitamin." The Journal of Applied Nutrition, Ernst T. Krebs, Jr. (R 302 at J–187).

". . . All the available facts indicate that Amygdalin is essentially non-toxic to laboratory animals and to humans." Raymond Ewell, Ph.D. in chemistry from Princeton, retired professor from the State University of New York at Buffalo. (R 302 at J–196).

Interestingly, however, Laetrile's candidacy for exemption from "new drug" status rests less on its "safeness" in fact than on its "generally recognized" reputation in that regard among qualified experts. *Durovic v. Richardson*, 479 F.2d 242, 250 (7th Cir. 1973). The record clearly reflects that previous to 1962 Laetrile was generally recognized as safe.[24]

## V

## THE "1938 GRANDFATHER CLAUSE" ISSUE

■■ An added ramification of the Act's grandfather clause is that a drug may escape the "new drug" machinery if it was marketed or officially recognized as a drug at any time before June 25, 1938, but after June 30, 1906, if the prescribed conditions for its use are unchanged. Thus, if Laetrile were marketed or officially recognized during those years as a cancer drug, it would not be subject to "new drug" instrumentalities of the 1962 amendments even though not generally recognized as safe or effective. *Rutherford v. United States*, (10th Cir. 1976) *supra*, 542 F.2d at 1142.

While Amygdalin (Laetrile) was indeed employed in combatting cancer previous to 1938, the record fails to establish the details of its use during that period sufficiently to successfully challenge FDA's denial of this exemption.

## VI

## "CONSTITUTIONAL ISSUES"

In plaintiffs' constitutional challenge of FDA's proscription they invoke rights fun-

---

**24.** "Among experts qualified by scientific training and experience to evaluate the safety of chemical substances in drugs, it is my information and belief that at least since the 1930's pure amygdalin has been generally recognized as safe for use by human beings either by injection, intravenously or intramuscularly, or by oral intake. For example, pure amygdalin may be administered without adverse effect in amounts of 10 grams per day, orally or 3 grams intravenously to a 150 pound man. . . ." Charles Gurchot, Ph.D. (R 302 at J–211 and 212).

The authoritative publication, *The Dispensatory of the United States* (1950 ed. p. 40) emphasizes that "Amygdalin itself is practically non-toxic . . . ." *Synopsis of Materia Medica, Toxicology and Pharmacology*, C. V. Mosby Company, 1944, p. 33, affirms that "the glucoside Amygdalin, given by injection, produces no harmful effects." (R 183 at 166F).

"With 45 years of study and research on the cancer problem, . . . I have found no statements of data on demonstrated, sustained pharmacological harmfulness to human beings of amygdalin at any dosages recommended or employed by physicians in the United States and abroad, up to the high level of 200 milligrams per kilogram of body weight per day (equals 15 grams-75 kilogram man-day), administered either orally or parenterally; and, more specifically no such statements by official opponents of the use by humans of amygdalin, including comment in their major publications. Few substances have been so widely investigated regarding non-toxicity and ·chemical definition as has amygdalin, by pharmacologists and chemists in many countries of the world, for over 125 years. . . . Amygdalin has been known and widely recognized for over one hundred years as nontoxic for man." Dean Burk, Ph.D., from the pamphlet *Vitamin B–17 . . . a Brief on Foods and Vitamins*. (R 302 at J–69 and J–65).

In its 1963 "Report on the Treatment of Cancer With Beta Cyanogenetic Glucosides ('Laetriles')" the only potential danger discerned by the Cancer Advisory Council of the State of California was "that the use of one or more of these substances in early cancer, to the exclusion of conventional treatment might well be dangerous since treatment with acceptable, curative methods (surgery or radiation) would thereby be delayed potentially until such time as metastases were manifest and the cancer might therefore no longer be curable. (R 183 at 246F) No toxicity was reported in the 1953 case study report of the Cancer Commission of California Medical Association.

It is only within the context of FDA's creation of this record that the specter of Laetrile's toxicity has even been raised. The drug's reputation for nontoxicity, even among its opponents, is amply documented. See, for example: "Harmless, but Ineffective Remedies," *The Journal of Pharmaceutical Sciences*, Oct., 1975. (R 180 at 190E) FDA allegations of toxicity appear to be more of an afterthought offered to bolster their other conclusions, rather than a reasoned conclusion based on a detached, impartial view of the record.

While apricot kernels can be poisonous if ingested in very large quantities, such contain enzymes not present in Amygdalin; thus, the toxicity of apricot kernels and Amygdalin are not comparable. Deposition of Raymond Ewell, Ph.D. (R 302 at J–197).

damental to a free society and inextricably related to enumerated constitutional concepts.

■ While the Constitution does not explicitly mention a right of personal privacy, it is unchallengeable "that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). This right has been discerned within the penumbras of the Bill of Rights, and specifically within the language of the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution, *Roe v. Wade, supra*. ". . . only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' . . . are included in this guarantee of personal privacy."

Mr. Justice Douglas referred to "the freedom to care for one's health and person" as coming within the purview of this right. *Doe v. Bolton*, 410 U.S. 179, 213 (1973), 93 S.Ct. 739, 758, 35 L.Ed.2d 201 (concurring opinion). "The right of privacy," Justice Douglas proceeded, "has no more conspicuous place than in the physician-patient relationship . . . ." *Doe, supra* at 219, 93 S.Ct. at 761. He concluded: "The right to seek advice on one's health and. the right to place reliance on the physician of one's choice are basic . . . ." *Doe, supra.*

This right of privacy has been characterized more than once as simply the right "to be let alone." *Doe v. Bolton, supra*, at 213, 93 S.Ct. 739 (Justice Douglas concurring); *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (Justice Brandeis dissenting). That right includes the privilege of an individual to plan his own affairs, for " 'outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases.' " *Kent v. Dulles*, 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204; *Doe v. Bolton, supra* 410 U.S. at 213, 93 S.Ct. 739, 758 (concurring opinion).

Many knowledgable and concerned individuals are questioning the effectiveness and wisdom of our orthodox approaches to combatting cancer. The correctness of their criticisms may not be determined for many years, and in any event such discussion provokes controversies largely beyond the realm of the courts' function. Nonetheless, it appears uncontrovertible that a patient has the right to refuse cancer treatment altogether, and should he decide to forego conventional treatment[25] does he

25. Such a decision is by no means necessarily indicative of suicidal tendancies. Dr. Hardin Jones of the University of California has presented impressive evidence in support of the thesis that in some instances at least untreated cancer victims outlive treated ones. (R 507) Conventional modes of treatment, particularly radiation and chemotherapy, can cause extensive damage to healthy organs and tissues as well as cancerous ones. Some argue that in destroying the body's natural defense mechanisms such approaches often destroy important weapons crucial to an effective fight against cancer and also greatly increase a patient's vulnerability to other life-threatening diseases as well.

Patients possessing particularized complicating factors, such as old age, frail physical constitutions, or certain types of religious convictions, might also understandably decide to forego the rigors of such conventional methodologies.

Even doctors who oppose the use of Laetrile will generally concede as to orthodox modes of treatment (surgery, radiation and chemotherapy): ". . . the treatments that are available are very often disfiguring; they can be painful; they can be unpleasant; they can even be risky." Emil J. Freireich, Professor of Medicine at the University of Texas, School of Medicine, Houston. (Tr. 204)

In attacking the credibility of "cures" reported to have been effectuated by Laetrile, FDA argues that in many such instances the person involved may never even have had cancer. "Even where the diagnosis has been done by someone other than a Laetrile proponent, a mistake is possible. Some cancers which are discussed in reference to Laetrile are very difficult to diagnose histologically. Thus, a diagnosis of cancer may often on later review be reversed." Commissioner's Decision (R 523 at 227) This analysis is hardly reassuring to individuals such as plaintiff Glen Rutherford, whose proposed surgery, a colostomy, would have unalterably lessened the quality of his life, irrespective of the ultimate outcome of his illness. (*See Rutherford v. United States*, 399 F.Supp. 1208 (W.D.Okl.1975).

not possess a further right to enlist such nontoxic treatments, however unconventional, as he finds to be of comfort, particularly where recommended by his physician?

■ We must carefully distinguish between the constitutional standards applicable to the use of an innocuous substance as a health-care aid, and those standards which apply to the promotion or advertisement of that same substance.

Plaintiffs seek to exercise final control over the handling of their own individual health-care problems. Numerous cancer patients possess extensive first-hand experience with Laetrile which has led them to believe, correctly or not, that the substance has eased their pain and prolonged their lives. Such personal convictions are not readily dispelled by government pronouncements or affidavits to the contrary.[26] When deprived of treatment in this country, they go elsewhere, and in so doing are denied close contact with their families and family doctors.

Unintentionally FDA has wrought needless hardship and expense to countless individuals required to travel to Mexico or Germany in order to utilize Laetrile. If it were more readily available in this country, perhaps many patients currently obtaining the treatment abroad could be persuaded to remain under their doctor's care here and use the substance in conjunction with conventional treatments.

The final consequences are ultimately borne by those whose bodies are the battleground on which cancer's war is waged. Many perceive the drug's acquisition as a life and death matter, and are understandably frustrated and enraged over attempts by their own government to deny them the right to decide for themselves questions of such a personal and grave nature.

Doubtless FDA desires to protect the public. Such good intention, however, is not the overriding issue. Many of us allocate time and money and other resources in ways susceptible to just criticism by many standards. Nonetheless, our political ideals emphasize that the right to freely decide is of much greater significance than the quality of those choices actually made. It is never easy for one who is concerned and feels himself particularly knowledgable to observe others exercise their freedom in ways that to him appear unenlightened.

As a nation, however, historically and continuously, we are irrevocably committed to the principle that the individual must be given maximum latitude in determining his own personal destiny.

To be insensitive to the very fundamental nature of the civil liberties at issue in this case, and the fact that making the choice, regardless of its correctness, is the sole prerogative of the person whose body is being ravaged, is to display slight understanding of the essence of our free society and its constitutional underpinnings. This is notably true where, as here, there are no simple answers or obvious solutions, uncertainty is pervasive, and even the best efforts leave so much to be desired.[27]

■ When certain "fundamental rights" are invoked, such as the right of privacy involved herein, regulation may be justified only by a "compelling state interest," and legislative enactments "must be narrowly drawn to express only the legitimate state interests at stake." *Roe v.*

26. "There can be few patients taking Laetrile in this country today who do not know that the government and most experts consider it worthless." Commissioner's Decision (R 523)

27. *1977 Cancer Facts and Figures* by the American Cancer Society estimates that 1977 will have produced an estimated 690,000 new cancer cases; and that over 54 million Americans now living will eventually have cancer, which is one out of every four Americans living. The pamphlet also states that over the years cancer will strike in approximately two of every three families, that in the 1970's there will be an estimated 3.5 million cancer deaths, 6.5 million new cancer cases, and more than 10 million people under medical care for cancer. Only about ⅓ of all people who get cancer this year will be alive five years after treatment, according to the publication. (R 173 at 113D)

*Wade, supra,* 410 U.S. at 155, 93 S.Ct. at 728. By denying the right to use a nontoxic substance in connection with one's own personal health-care, FDA [28] has offended the constitutional right of privacy.

This court's decision in this case in no way portends the return of the traveling snake oil salesman. As emphasized earlier, the right to use a harmless, unproven remedy is quite distinct from any alleged right to promote such. FDA is fully empowered under other statutory provisions to combat false or fraudulent advertising of ineffectual or unproven drugs. *See* the Food, Drug and Cosmetic Act, Misbranded Drugs and Devices, 21 U.S.C. § 352 (1976); and the Federal Trade Commission Act, Dissemination of False Advertisements, 15 U.S.C. § 52 (1975).

The Commissioner's "Laetrile" Decision of July 29, 1977, must be vacated. An appropriate Order will accordingly be entered herein.

### ORDER

This action came on for determination by the court, and the issues having been duly considered and a decision having been duly rendered as set forth in the Opinion of even date herewith,

IT IS ORDERED, ADJUDGED AND DECREED:

1. The action of the Commissioner of Food and Drugs dated July 29, 1977, is declared unlawful and such action, findings and conclusions are hereby vacated, set aside and held for naught;

2. Laetrile (Amygdalin) is exempt from the "new drug" requirements of 21 U.S.C. § 355(b);

3. The Secretary of Health, Education and Welfare and his subordinates in the Food and Drug Administration are hereby permanently enjoined and restrained from interfering, directly or indirectly, or acting in concert with United States Customs Service or others, with the importation, introduction, or delivery for introduction into interstate commerce by any person of Laetrile (Amygdalin) for the reason that application has not been filed or approved in the manner provided by 21 U.S.C. § 355(b) for a "new drug";

4. The Secretary of Health, Education and Welfare and his subordinates in the Food and Drug Administration are hereby permanently enjoined and restrained from interfering with the use of Laetrile (Amygdalin) for the care or treatment of cancer by a person who is, or believes he is, suffering from the disease;

5. The Secretary of Health, Education and Welfare and his subordinates in the Food and Drug Administration are hereby enjoined and restrained from interfering with any licensed medical practitioner in administering Laetrile (Amygdalin) in the care or treatment of his cancer patients;

6. The Secretary of Health, Education and Welfare shall distribute or cause to be distributed to all personnel within the Food and Drug Administration and the United States Customs Service concerned or involved in the enforcement of the Food and Drug Act copies of the Opinion and Order herein, and shall file with the Clerk of this Court within twenty (20) days of the date hereof his certificate showing distribution as required herein;

7. This Order is binding upon the Secretary of Health, Education and Welfare, his agents, servants and employees in the Food and Drug Administration, present and future, and upon those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise;

---

28. Even if no such right existed generally, it would appear that Laetrile's use by terminally ill cancer patients who have exhausted orthodox approaches or cancer patients interested in using Laetrile only in conjunction with conventional methods would be constitutionally protected. While certain problems may attend exact definitions of "terminally ill," the term has a well understood meaning and is of practical significance to our discussion.

8. The Clerk of this Court shall serve by certified mail, deliver to addressee only, return receipt requested, Joseph A. Califano, Secretary of Health, Education and Welfare; Donald Kennedy, Commissioner of the Food and Drug Administration; and Vernon D. Acree, Commissioner of the U.S. Customs Service and their attorneys of record, certified copies of the Opinion and Order herein;

9. The Court hereby retains jurisdiction for all further orders appropriate and necessary to enforce this Order or to adjudicate any dispute arising hereunder. Any complaints arising under this Order by any party shall be heard by the Court on not less than five (5) days notice to the opposing party.